(79 Misc. Rep. 668.)

## In re PEISER'S WILL.

(Surrogates' Court, New York County. March 10, 1913.)

1. COURTS (§ 89*)—"STARE DECISIS"—"RES JUDICATA."
   The doctrine of "stare decisis" is not the equivalent of "res judicata," as it relates, not to facts, but to the legal principles involved.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 311, 312; Dec. Dig. § 89.*
   For other definitions, see Words and Phrases, vol. 7, pp. 6126–6130; vol. 8, pp. 7786, 7787; vol. 7, pp. 6627, 6628.]

2. WILLS (§ 111*)—SIGNATURES—"END OF WILL."
   Under the statute of wills (2 R. S. [1st Ed.], pt. 2, c. 6, tit. 1, § 40; Decedent Estate Law [Consol. Laws 1909, c. 13] § 21), requiring wills to be signed at the "end," the grammatical and not the physical end of the will, is meant, so that where a will was written on a single piece of legal cap paper in such a manner that when folded once the will began on page 1, continued on page 4, and then returned to page 2, where it ended and was signed, the signature was at the "end of the will."
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 267–275; Dec. Dig. § 111.*
   For other definitions, see Words and Phrases, vol. 3, pp. 2387, 2388; vol. 8, p. 7649.]

Application for the admission to probate of the last will and testament of Michael Peiser. Probate granted.

Feiner & Maass, of New York City (Ira Skutch, of New York City, of counsel), for proponents.

Joseph J. Baker and Emil Adler, both of New York City, for testamentary beneficiaries in aid of proponents.

Henry K. Heyman, of New York City, special guardian, for proponents.

Moses R. Ryttenberg, of New York City, for contestant Peiser.

Richard M. Bruno, of New York City, for other contestants.

FOWLER, S. There is but a single question in this cause: The paper propounded by inspection is readily seen to consist of two sheets of legal cap, woven together in the web and never cut since they came from the paper maker. In other words, the two sheets are only such by manner of folding. Originally they were fabricated in one long sheet. As folded they now make two sheets, or four pages, susceptible of being written on. These two sheets, or four pages, are now backed by a separate cover fastened on by removable metal staples. The cover is indorsed "Last Will and Testament of Michael Peiser, November 18th, 1908." The cursive script propounded covers the front page of the first or uppermost sheet, continues consecutively on the reverse

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

side of the second or lowermost sheet, and then returns to the reverse side of the first sheet, ending thereon with the subscription of the testator, followed by a full attestation clause, subsigned by the attesting witnesses. In other words, the signature of the testator is on the reverse side of the first sheet, and is followed by a blank page, overwritten only on its reverse side. The reverse side, or third page, is not signed or identified by the testator. It follows in position page 2, where the testator's signature alone appears.

In the better and more concise language of counsel for the beneficiaries:

"If we treat the paper propounded as having four pages, the obverse and reverse sides of the first sheet being treated as pages 1 and 2, and of the second sheet as pages 3 and 4, we can then say that the will starts on page 1, is continued on page 4, and concluded on page 2."

It is page 2 which contains the signature of testator. This signature is followed by the ordinary attestation clause, subsigned by the attesting witnesses in the usual manner. There being no allegation of fraud or forgery in this cause, and no suspicious circumstance disclosed, the authenticity of the testamentary script propounded being admitted, the presumption is that the will propounded is in the same condition it was in when the testator and the attesting witnesses placed their respective signatures on it, and the testator duly declared it to be his last will and testament and requested the attesting witnesses to act as such. In re Cattrall, 1863, 3 S. & T. 419, 421. But without the aid of legal presumption, the paper propounded bears both internal and external evidences of genuineness and that it was composed and written at the same time, and in its present order. When the draftsman of the will had ended writing on the first page, he had finished only a part of the third dispositive clause of the will. He then reverted to the fourth blank page where, at the top of the page, he was at pains to note in writing, "Third (continued)," evidently meaning that the third clause of the will which began on the first page was to be continued on the fourth page as, in fact, it was.

The written language of the three utilized pages is closely consecutive and in order. The entire paper contains internal evidence that the will was all composed and transcribed at the same time. Without the aid of the writing on the fourth page, or in other words on the reverse side of the second sheet, the balance of the testamentary paper is unintelligible. It is manifest that the draftsman of this will began writing on the first page, turned over to the fourth page, which he filled with words, and then went back to the second page, where he ended the will and caused it to be subscribed by the testator and subsigned by the attesting witnesses. As already stated, there is no issue of fraud or forgery involved in this probate proceeding, and there is manifest an intention on the part of the testator to comply with the statute of wills. The only question before me, then, is:

"Is the testamentary script, propounded, subscribed in this particular instance by the testator at the end thereof, within the true meaning and requirements of the statute of wills (2 R. S. pt. 2, c. 6, tit. 1, p. 63, § 40, now section 21, Decedent Estate Law)?"

Had it not been for the decision of the Court of Appeals in Matter of Field, 204 N. Y. 448, 97 N. E. 881, 39 L. R. A. (N, S.) 1060, I should have no hesitation in holding that prior decisions of this state compelled me to conclude that the paper propounded was not subscribed by the testator at the end thereof within the meaning of the present statute of wills. Matter of Whitney, 153 N. Y. 259, 47 N. E. 272, 60 Am. St. Rep. 616; Matter of Andrews, 162 N. Y. 1, 56 N. E. 529, 48 L. R. A. 662, 76 Am. St. Rep. 294; Matter of Blair, 152 N. Y. 645, 46 N. E. 1145, affirmed 84 Hun, 581, 32 N. Y. Supp. 845; Matter of Conway, 124 N. Y. 455, 26 N. E. 1028, 11 L. R. A. 796; Matter of O'Neil, 91 N. Y. 516; Sisters of Charity v. Kelly, 67 N. Y. 409. Although in principle these cases are often attempted to be distinguished by reason of certain special features peculiar to each case, I confess I am utterly unable to distinguish this case before me from the principle of those decisions. Those decisions place form above substance. But Matter of Field modified this rule, and I am now to determine whether or not this will is within the principle announced in Matter of Field. If it is so. I must pronounce for the will; otherwise, against it.

[1] When I just said "within the principle announced in Matter of Field," I should explain what I mean. The principle of "stare decisis" is not the equivalent of "res judicata." The latter term relates more to controversies on pleas in bar and to the particular judgments rendered on the peculiar facts of a given case. It is a very trifling conception of the doctrine of stare decisis to affirm that it applies only when the identical facts are again shown and the court must render a precisely similar judgment. If that were the true limitation of the doctrine of stare decisis, the difficulty would be that in all human probability the facts of one cause could never again be precisely repeated in any future cause. All logicians concede that identity, or coexistence, or coinherence, is a relative term or figure of speech. Identity exists only in mathematical science or in the abstract, if at all. The doctrine of stare decisis relates to legal principles, not to facts. At common law the only thing in a decision binding as authority under the rule stare decisis is the right principle upon which the case was decided—ratio decidendi—and not the application of such principle. Lord Walpole v. Earl of Cholmondeley, 7 T. R. 138, 148; Lord Elden in Browning v. Wright, 2 B. & P. 13, 24; Merry v. Hickalls, L. R. 7 Ch. 733, 750, 751; Osborn v. Rowlett, 13 Ch. D. 774, 785; Lord Herschell in Trego v. Hunt, 1896, A. C. 7, 14. While these are English decisions, and by reason of their late date of no authority here, they well express the common-law doctrine often recognized here, and our common law is the same on this point. Carroll v. Lessee of Carroll, 16 How. (U. S.) 275, 286, 14 L. Ed. 936.

[2] The principle of the adjudications of this state prior to the year 1912 was that our statute of wills required a will to be subscribed by the testator at the physical or actual end or foot of the testamentary document. It would not do prior to 1912 to subscribe a testament in the middle of the paginal order, or even at the logical, or intellectual, or speaking end of a will not written in a consecutive order of pagination. If the adjudications prior to 1912 do not disclose this principle,

they disclose nothing else to my mind. It is idle to attempt to reconcile the decisions of our courts prior to 1912 with any other conclusion, and I will not resort to such an effort. There was by those decisions, in short, no such thing as a "constructive end" of a will. Since Matter of Field there is a "constructive" as well as an actual or physical end of a will. The physical end of the will in order of pagination alone no longer determines the true place for testator's signature.

The history of the English Law of Wills under the English "Wills Act" of 1837 (1 Vict. c. 26) illustrates what I mean. Section 9 of that act provided:

"That no will shall be valid unless it be in writing and executed in manner hereinafter mentioned; that is to say, it shall be signed at the foot or end thereof by the testator or by some other person in his presence and by his direction."

The tendency of the English decisons on the act of 1 Victoria was to hold that the "foot or end" meant the physical, and not the logical, or speaking, end of the will (Smee v. Bryer, 1 Rob. 616, 6 Moo. P. C. 404; Allen v. Maddock, 11 Moo. P. C. at page 456), although occasionally the English courts were induced to take a less literal view of the statute of wills, and to hold that that statute intended that the testator might sign at the logical, and not the physical, end of the will. The conflict of the decisions and the constant judicial destruction of wills under section 9 of the Wills Act of 1 Victoria created such popular dissatisfaction in England that section 9 of the Wills Act was amended by the Wills Amendment Act of 1852, called "Lord St. Leonards' Act" (15 Vict. c. 24), which tended to make testator's subscription valid if it was actually made at the "logical, or speaking, or intellectual," end of the will, without regard to the natural arrangement of the pagination of the testamentary medium. But the explanatory act of 1852 is very unlike Lord Leonards' other technical work, as it is, I think, both prolix and confused and not to be imitated here. It contains a saving clause which to my mind nullifies the benefit intended. It provides:

"That no signature under the said act or this act shall be operative to give effect to any disposition or direction which is underneath or follows it, nor shall give effect to any disposition or direction inserted after the signature shall be made."

This reopens the whole question concerning the true end of a will, and modern English authorities are not very illuminating on this point.

The result of Lord St. Leonards' Act has been, I think, in England that much oral or extrinsic evidence is admissible to show the actual condition of the testamentary script at the time the testator signed it. The consequence of this line of authority is to make a valid execution of a will in writing more largely dependent on extrinsic evidence than I should think at present expedient in like cases under a statute which requires wills to be in writing. Matter of Blair, 84 Hun, 581, 584, 32 N. Y. Supp. 845; Matter of Will of Hewitt, 91 N. Y. 261, 264. But I have not fully investigated that point of evidence as it is not now here. I have therefore no deep-seated conviction on it. Much is to be said for and against the admission of extrinsic evidence in such cases.

But even since the Wills Amendment Act of 1852 in England, the

English courts are (where nothing actually dispositive follows the signature of the testator) inclined to ignore the actual order of the pagination of a testamentary paper, and to hold that if the testator signs at the logical or speaking end of an ill-arranged continuous script there is a substantial or constructive compliance with the statute. In bonis Wotton, 1874, 3 P. & D. 159; In bonis Birt, 1871, 2 P. & D. 214; In bonis Ainsworth, 2 P. & D. 151; In bonis Coombs, L. R. 1 P. & D. 302. Of course these late English decisions, though entitled to great respect as opinions of learned men, are not authorities in this jurisdiction.

Under our present statute of wills, and long before the decision in the Matter of Field, the surrogate of this county, in the year 1847, had said that that statute was open to the construction that the end of the will meant, not the physical end only (for, as he correctly stated, there are two physical ends to a paper), but the intellectual or speaking end of the script, which does not admit of two dimensions. Matter of John Tonnele's Will, 5 N. Y. Legal Observer, 254. In other words, the surrogate interpreted the statute of wills largely, so as to make the requisite of the statute apply to the constructive and not to the merely actual end of a testamentary paper. In England what the surrogate, in Matter of Tonnele's Will, called the "intellectual or speaking end of a will," is generally termed "the logical end." In re Goods of Walton, L. R. 3 P. & D. 159; Goods of Stoakes, 23 Week. Rep. 62. The judgment in Matter of Field, in 1912, goes not one whit farther than that of the surrogate in 1847; it makes the end of the will not the physical end only, but the logical or speaking end of the instrument, as actually written. In a case where there is shown no suspicious circumstance or any fraud or imposition, and the testamentary script is in perfect grammatical sequence, and it is apparent that the testator, as matter of fact, signed his will at the logical or grammatical end thereof, and there is no inherent evidence that any dispository clause was written after such subscription, then the physical arrangement of the pages or sheets will not be controlling, and, in the absence of proof to the contrary, the grammatical context will be suffered to determine the end of the will. Such, I think, is the principle of the decision in Matter of Field, under the true doctrine of stare decisis, before noticed.

The case before me I am unable to distinguish in principle from Matter of Field. This testator, Mr. Peiser, signed at the place where the draftsman of his will "stopped writing in the consecutive order of composition." The will, when read consecutively "as the mass of mankind would read it," has the signature of the testator at the end thereof, within the meaning of the statute of wills. This case and Matter of Field much resemble the English case "Goods of Stoakes," cited before, where the same conclusion was reached. I find that Mr. Peiser's will sufficiently complies with the statute of wills in view of the facts disclosed by the evidence.

The paper propounded is therefore entitled to probate. Decree accordingly.